# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| BARBARA FAIR,<br>　　　Plaintiff,<br><br>　　　v.<br><br>DEAN ESSERMAN,<br>　　　Defendant. | No. 3:15-cv-681 (SRU) |

## RULING AND ORDER

On May 7, 2015, the plaintiff, Barbara Fair, filed a complaint against the defendant, Dean Esserman, the Chief of the New Haven Police Department, in both his personal and official capacities, alleging that Esserman violated Fair's First Amendment rights, and therefore 42 U.S.C. § 1983, by preventing her from attending two public meetings to discuss police misconduct following her critical comments about the police in a previous meeting. (doc. 1) Esserman has moved for summary judgment on the basis that the meetings were not open to the public, or alternatively that the limitation on Fair's speech and attendance at the meetings was permissible. (doc. 51) On February 28, 2017, I held a hearing on that motion. (doc. 59)

For the following reasons, Esserman's motion for summary judgment is **denied** in substantial part.

**I.　　Standard of Review**

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.     Background

The following relevant facts are taken from the parties' Local Rule 56 Statements and Fair's Affidavit and are undisputed unless otherwise indicated. *See* Def.'s L.R. 56(a)(1) Stmt. (doc. 51-1) [hereinafter "Def.'s 56a1"]; Pl.'s L.R. 56(a)(2) Stmt. (doc. 54) [hereinafter "Pl.'s 56a2"]; Fair Aff. (doc. 55-1).

Barbara Fair is a resident of West Haven, Connecticut. She considers herself to be an activist. During the relevant period, Dean Esserman was the Chief of the New Haven Police Department, although he has subsequently stepped down. As Chief of Police, Esserman held "ComStat" meetings in which District Managers from the Department shared information about the police activities in their districts. ComStat meetings were held on a roughly weekly basis, although there were weeks during which no such meetings occurred, and the meeting schedules were not listed on the City website or otherwise advertised to the public. The meetings did not have a formal agenda, although Esserman stated in his deposition that certain issues related to privacy and internal investigations were never discussed at the meetings.

3

Prior to the incidents giving rise to this complaint, Esserman had opened ComStat meetings to public attendance. In his deposition, Esserman described the public's participation as follows:

> It was not a forum for discussion. It was to let people see how the police department worked in a transparent way, and if people had presentations they wanted to make we would try to schedule them in.

Esserman Dep., Def.'s 56a1, Ex. 5 at 32–33 (doc. 51-7); *see also id.* at 35 ("[T]he format of the meeting was very businesslike[.] . . . [I]t was really an opportunity for people to see us work in a transparent way. . . .This was not a community forum."). Esserman further asserted that the meetings were "not really" open to questions from public attendees, but stated that "at the end of the meeting we'd go around the room and say does anyone have anything left out?" *Id.* at 34. Members of the public were generally not required to ask for permission before attending the meetings, *id.* at 33, although they could be excluded from meetings in which particularly sensitive topics would be raised, *id.* at 50. Prior to the events giving rise to this action, Fair had attended two or three ComStat meetings.

In March of 2015, Fair saw a video of the New Haven Police Department arresting a 15-year–old girl in a manner she thought was excessive. She participated in public protests against the actions of the police at City Hall and at the police headquarters. At the City Hall protest, Fair asserts that she overheard police officers and counter-protesters making disparaging and racially-charged remarks. Shortly thereafter, Fair attended one of the Department's ComStat meetings ("Meeting 1"). Esserman was not present at that meeting, which was presided over by the Assistant Chief of the Department. At the end of Meeting 1, the Assistant Chief moved to close the meeting without formally asking for comments from the community. Fair Dep., Def.'s 56a1, Ex. 1 at 56 (doc. 51-3). Fair nevertheless asked the Assistant Chief for permission to speak, which permission was granted. Although the content of her speech was not recorded, the parties

4

appear to generally agree that she was critical of the police, expressed concern over the comments she had heard at the protest, and questioned some officers' commitment to serve minority populations in New Haven. The parties disagree whether Fair also discussed an internal affairs investigation into one of the officers involved in the contentious arrest. None of those issues had previously been discussed during the meeting.

The parties disagree about the reception of Fair's comments. Fair stated in her deposition that her comments upset one officer, but that a second officer told him to let her speak and expressed his agreement with her concerns about the protests. Fair Dep. at 51–52; *see also* Fair Aff., Pl.'s 56a2, Ex. 1 at ¶ 11 (doc. 55-1). Following that exchange, Fair stated that the meeting was closed without further incident. *See* Fair Dep. at 52; Fair. Aff at ¶ 11. Esserman stated that he was informed by attendees at the meeting that Fair's conduct had been "disruptive," "loud" and "argumentative." Esserman Dep. at 46–47. He did not, however, submit any evidence from a party who experienced the alleged disruption first-hand. And the parties appear to agree that Fair was not reprimanded, asked to stop talking, or asked to leave Meeting 1 as a result of her comments. After Meeting 1, Fair emailed the Assistant Chief about her comments. Although the email and his response are not in the record for this motion, the parties agree that the email included Fair's admission that: "I know I ruffled some feathers."

Fair returned to the Department for the following ComStat meeting ("Meeting 2"). Esserman approached Fair before the beginning of the meeting and asked her to leave. Esserman stated in his deposition that he told Fair her comments had been "disruptive" and had made other people "very uncomfortable." Esserman Dep. at 51–52. Fair stated she was asked to leave on the

5

grounds that her comments at Meeting 1 had been "rude and disrespectful."[1] Fair Dep. at 65. Fair asked whether the meeting was still a "public meeting." *Id.* Esserman said that it was. *Id.* Fair asked whether she was under arrest. *Id.* Esserman said she was not. *Id.* Fair refused to leave, stating that "as long as it's a public meeting I'm going to sit here." *Id.* at 66. Esserman then closed the meeting to the public and asked all members of the public to leave. *Id.*; *see also* Def.'s 56a1 at ¶¶ 29–33 (describing the same arc of events with less detail).

On April 9, 2015, Fair attempted to enter a third ComStat meeting ("Meeting 3"). She was accompanied by Connecticut State Senator Gary Winfield. Esserman Dep. at 69. Sergeant John Wolcheski was on duty at the front desk at that time. He had previously been informed that the meeting was closed to the public. Wolcheski accordingly denied access to Fair and Winfield. They left without speaking to Esserman. Wolcheski also initially denied access to Reverend Kimber, but Rev. Kimber contacted Esserman directly and was then admitted to the meeting as a scheduled speaker.

Fair has not attempted to attend any further meetings, but Esserman stated in his deposition that there is no ongoing bar against Fair's attendance.

## III. Discussion

Fair alleges that Esserman's conduct constituted both a direct violation of her First Amendment rights and impermissible retaliation for her exercise of those rights, for which she seeks both damages and injunctive relief.[2]

---

[1] The parties did not seek to agree on the exact content of Esserman's explanation as a "material fact" in their Local Rule 56 statements, and although Esserman stated in his deposition that Fair's daughter was filming that encounter, that film is not part of the record for this motion. Esserman Dep. at 52.

[2] Esserman argues that to the extent Fair is still seeking injunctive relief, that claim should be denied as moot because Esserman is no longer employed as the Chief of Police. Def.'s Br. at 1 n.1. The complaint states that Esserman was sued "in his individual and official capacities." Compl. at ¶ 4. Accordingly, the claim for injunctive relief against Esserman in his personal capacity is **dismissed** and the claim for such relief against Esserman in his

6

A. Direct First Amendment Violation Claim

The Supreme Court has articulated a three-step test to determine whether the government's limitation on speech violates a First Amendment right: first, the court must determine whether the plaintiff's speech is protected; second, the court "must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic;" and finally, the court must "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).

Esserman apparently concedes that Fair's speech regarding racism in the Department was protected. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.") (quotation marks and citation omitted); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) ("The right[] to complain to public officials . . . [is] protected by the First Amendment."). Accordingly, I first consider the appropriate forum classifications for ComStat Meetings 1, 2, and 3, and whether the restrictions on Fair's speech in the latter two meetings—there does not appear to be an allegation that her speech was restricted in any way in Meeting 1—were permissible under the relevant standards. In the course of that discussion, I take up a separate theory of First Amendment violation not squarely briefed by the parties—namely, whether a State actor can change the status of a forum *temporarily* in order to exclude a speaker.

---

official capacity will proceed, but the current Chief of Police should be substituted in for Esserman pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See Correction Officers Benev. Ass'n v. Kralik,* 2009 WL 856395, at *5 (S.D.N.Y. Mar. 26, 2009).

1. *Forum Classification*

Proper classification of the forum for constitutional protection should be a fact-specific inquiry that considers the traditional use of the forum; governmental intent, policy, and practice; and the nature of the space and its compatibility with expressive activity. *See Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, 143 (2d Cir. 2004) (citing *Cornelius*, 473 U.S. at 802, and *General Media Communs. v. Cohen*, 131 F.3d 273, 278 (2d Cir. 1997) (corrected opinion)). As a practical matter, however, courts and litigants generally focus on which of three major categories recognized by the Supreme Court best describes the forum at hand—namely, whether it is (1) a traditional public forum, such as streets and parks, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45 (1983) (quotation marks and citation omitted); (2) a designated public forum, which is "'a place not traditionally open to assembly and debate' 'which the State has opened for used by the public as a place for expressive activity,'" *Make the Road*, 378 F.3d at 143 (quoting *Cornelius*, 473 U.S. at 802, and *Perry*, 460 U.S. at 45, respectively); or (3) a nonpublic forum, which is "public property not traditionally open to public expression or intentionally designated by the government as a place for such expression." *Id.* The Second Circuit has also identified as a subset of the designated public forum classification the limited public forum, in which "the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* (quotation marks and citations omitted). Each type of forum carries its own standards by which to evaluate the constitutionality of limitations on expressive activity.

The parties agree that none of the ComStat meetings constituted a "traditional public forum." Instead, they debate whether the meetings should be classified as limited public forums or nonpublic forums.

   a. ComStat Meeting 1

In *Make The Road by Walking, Inc. v. Turner*, 378 F.3d 133, the Second Circuit provides a helpful discussion of the distinction between limited public forums and nonpublic forums. *See id.* at 143–46. The Court focused on whether permission to speak or the topics on which speech is permitted were governed by general or selective access policies—for instance, a selective access policy requiring a speaker to seek individualized permission in order to speak suggests the forum is nonpublic. *Id.* at 144. The Court also considered the government's justification for imposing a particular kind of access policy—for instance, if a selective access policy is imposed in order to further internal government objectives, such as facilitating communication among government workers or minimizing disruption in a federal workplace, there is a still stronger implication that the forum is nonpublic. *Id.* at 145 n.6. Finally, the Court considered the physical characteristics of the forum, including its location in an area separated from "acknowledged public areas." *Id.* at 145 (quoting *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992) [hereinafter "*Lee*"]).

It seems clear that, viewing the record in the light most favorable to Fair, Meeting 1, and prior ComStat meetings opened to the general public, should be classified as limited public forums rather than nonpublic ones. The meetings were opened to the general public by the admittedly deliberate choice of Esserman as chief of police. Some courts have found that because the very physical presence of members of the public at a government meeting can communicate an important message, even permitting the general public to attend silently may be

sufficient to create a limited public forum. *See ACT-UP v. Walp*, 755 F. Supp. 1281, 1288 (M.D. Pa. 1991) (in the context of access to a state legislature's gallery, observing that "the communication in the between the chamber and gallery works two ways: the audience listens to the political decisionmaking of the elected officials, and the elected officials receive the message, by the very presence of citizens in the gallery, that they are being watched, that their decisions are being scrutinized, and that they may not act with impunity outside the watchful eyes of their constituents"); *see also id.* ("One need not speak to make a point.") (collecting cases). Moreover, within the limited topic of community policing, a reasonable jury could infer from the record that the meetings also included a general invitation for comment from the public—although Esserman asserted in his deposition that the meetings were "not really" open to questions from public attendees, he also stated that "at the end of the meeting we'd go around the room and say does anyone have anything left out?" Esserman Dep. at 34. Indeed, Fair was able to take advantage of that opportunity at Meeting 1 without being invited to speak and without any prior vetting of her comments.

Esserman's countervailing arguments for a nonpublic forum classification largely raise irrelevant concerns. His brief emphasizes that the ComStat meetings did not fall under the Connecticut state law definition of public meetings for the purposes of FOIA, *see* Def.'s Br. at 14–16; however, the forum classification inquiry looks at the state actor's discretionary choices and practice, rather than focusing on tangential statutory obligations. In the same vein, Esserman emphasizes that he could have closed the meetings to the public at any time. *See* Def.'s Br. at 15. That is, in fact, a recognized characteristic of *all* designated public forums, *see Perry*, 460 U.S. at 46; however, as long as the forum remains open, government regulation of speech within in must meet the standards of a public forum. *See Lee*, 505 U.S. at 678.

i. <u>Standards Governing Limitation on Speech in Meeting 1</u>

Having determined that Meeting 1 is a limited public forum, I must consider what standards govern any governmental regulation on speech in that forum—although there is no allegation that Fair's speech actually was limited in Meeting 1, it is helpful to characterize the context of her speech act in order to evaluate the permissibility of the actions that followed.

In a limited public forum, speech falling within the categories or topics permitted in that forum are subject to the same limitations as for any other public forum, s*ee Lee*, 505 U.S. at 678—that is, content-neutral time, place, and manner regulations are permissible if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication, whereas content-based restrictions must be necessary and narrowly tailored to serve a compelling state interest. *See Perry*, 460 U.S. at 45; *Make the Road*, 378 F.3d at 142. Restrictions on speech falling outside of the permitted categories, however, are subject to the same limitations as any other nonpublic forum—that is, restrictions must only be reasonable and viewpoint neutral. *Make the Road*, 378 F.3d at 134.

Esserman implicitly suggests that Fair's comments at Meeting 1 could have been validly subject to limitations either because they were not made in an appropriate manner or because they fell outside of the permitted categories, and as a result of either of those violations, impeded the valid purposes of the meeting. Viewing the record in the light most favorable to Fair, however, neither of those implications is supported beyond any genuine dispute. First, although Esserman asserts that he received complaints that Fair's comments were loud, argumentative, and disruptive, he has not pointed to any evidence from any person with first-hand knowledge and, more importantly, the complaints he received appear to have been based on the *content* of her statements—his testimony could be read to suggest that he was responding to some people

who were upset and angered by what she said rather than by how she said it.[3] *See* Esserman Dep. at 46–47. By contrast, Fair has presented evidence that her comments were made in an appropriate manner, were well-received by at least one police officer, and were followed by a "peaceful" end to the meeting. Fair's post-meeting email admitting that she had "ruffled some feathers" similarly does not amount to a conclusive admission that the manner in which she spoke was inappropriate for the forum; instead, it is equally compatible with a recognition that the content of her comments was controversial.

Esserman also implies that Fair exceeded the permissible topics allowed for the meeting by discussing conduct "that subjected an officer to an internal affairs investigation" and internal investigations were off-limits at ComStat meetings. *See* Def.'s Br. at 17. Fair, however, asserts that her speech concerned officer conduct at a protest and the police's commitment to serving minority populations—topics that would seem to be appropriate in a meeting regarding strategies for community policing—and denies that she discussed any internal affairs investigation or any other private topic. Fair further asserts that she was not informed of any specific limitations on permissible topics, nor was she provided with an agenda cabining the topics of the meeting. Again, viewing the record in the light most favorable to Fair, one could infer that her comments fell within the permissible topics for the meeting.

In sum, a reasonable jury could find on this record that Fair had and appropriately exercised a First Amendment right to speak at Meeting 1 on the permissible topic of police interactions with minority communities.

---

[3] Contrary to the suggestion of defense counsel at the hearing, speech is not considered "disruptive" merely because it is offensive to the listener, even if the offended party is a member of law enforcement. *See Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (observing that protesting racial discrimination in a government agency is "a matter inherently of public concern").

b.  ComStat Meetings 2 and 3

ComStat Meetings 2 and 3 were closed to the public, apparently as a result of Fair's comments in Meeting 1. As noted above, determining that the government has opened a nontraditional forum to the public does not permanently change the characteristics of that forum. The government "is not required to indefinitely retain the open character of the facility," and may indeed close the forum entirely to the public as it sees fit. *Cornelius,* 473 U.S. at 802; *see also Sons of Confederate Veterans, Virginia Div. v. City of Lexington, Va.*, 894 F. Supp. 2d 768, 773–74 (W.D. Va. 2012), *aff'd,* 722 F.3d 224 (4th Cir. 2013) (collecting court of appeals decisions recognizing that the government may change the character of a nontraditional forum at will). Moreover, the Supreme Court has clearly stated that the First Amendment is not violated by a decision to close a formerly limited public forum "simply because [that decision] was motivated by the conduct of the partisans on one side of a debate." *Hill v. Colorado*, 530 U.S. 703, 724 (2000); *see also Sons of Confederate Veterans, Virginia Div. v. City of Lexington, Va.*, 894 F. Supp. 2d 768, 774 (W.D. Va. 2012), *aff'd,* 722 F.3d 224 (4th Cir. 2013) (discussing a ban on the private use of state flagpoles enacted apparently in direct response to a request from a pro-Confederate group).

The parties dispute whether Esserman actually closed Meetings 2 and 3 to all members of the general public, particularly in light of Reverend Kimber's attendance at the third meeting. Regardless of the outcome of that factual dispute, however, it is important to note that Esserman's deposition suggests that he closed the ComStat meetings to the public only *temporarily*. *See* Esserman Dep. at 59–60 (stating that he did not recall whether the public was barred from subsequent meetings, and that Fair would be permitted to attend meetings at that time). Other courts have noted that the Supreme Court's First Amendment framework does not clearly address how to evaluate a temporary but total shutdown of a given forum. *See Rhames v.*

*City of Biddeford*, 204 F. Supp. 2d 45, 52 (D. Me. 2002). Nevertheless, it seems clear that a temporary shutdown intended to stifle discussion on a particular topic, with plans to reopen the forum after controversy surrounding that topic had been suppressed constitutes impermissible censorship under any First Amendment analysis—indeed, such conduct is "the spitting image of prior restraint." *ACT-UP v. Walp*, 755 F. Supp. 1281, 1290 (M.D. Pa. 1991) (citing Larry Tribe, *American Constitutional Law* 1040 (2d ed. 1988), and *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975)); *cf. Lakewood v. Plain Dealer Publishing Company*, 486 U.S. 750, 758–68 (1988) (observing, in the context of the unbridled discretion doctrine, that there is a significant difference between banning an activity altogether and permitting it on a wholly discretionary basis, because, in the latter case, arbitrariness and unpredictability may provide easy cover to censorship).

For instance, in *ACT-UP v. Walp*, 755 F. Supp. 1281 (M.D. Pa. 1991), the court recognized that the temporary closure of a legislative gallery to the general public on a given date was, in fact, a content-based restriction aimed at preventing members of the AIDS-awareness group, ACT-UP, access to a limited public forum on the basis of their anticipated protest-speech. *Id.* at 1289. The *ACT-UP* Court further rejected the government's argument that its interest in avoiding disruption was sufficiently compelling to justify that restriction, observing that there was "no reasonable basis for fearing that [the relevant] speech would be disrupted." *Id.* In the same vein, in *Rhames v. City of Biddleford*, 204 F. Supp. 2d 45 (D. Me. 2002), in the context of a temporary moratorium on a public access television channel, the court presented the following hypothetical:

> It is true that a city should not be able to shut down a park or a bandshell temporarily so as to avoid a particular speech or a particular concert—that is not a viewpoint neutral measure and violates the First Amendment.

*Id.* at 53.

Drawing all inferences in favor of Fair, a reasonable jury could find that similar conduct occurred in the present case—that is, they could find that: (1) Fair spoke in a permissible manner, on a permissible topic, and without causing disruption at ComStat Meeting 1; (2) as a result of his disapproval of the content of Fair's speech and with no meaningful indication that she would actually disrupt any future meeting, Esserman enacted a ban on public participation that, although universally applied, was in fact intended to silence her speech; and (3) after it became clear that Fair and other like-minded individuals no longer sought to attend the meetings to express their views, the meetings were reopened apparently without any new or additional limitations on public attendance and participation.

That conduct would be impermissible regardless whether it took place in the context of a limited public or a nonpublic forum. Like in *ACT-UP*, a reasonable jury could easily find that the temporary closure was not content-neutral, but was instead specifically intended to silence Fair's comments on a controversial topic, and Fair has raised at least a genuine issue of fact regarding whether Esserman had any reasonable basis to believe her presence or any ensuing comments she might make would disrupt the meeting. And similarly, assuming Meetings 2 and 3 were effectively converted to nonpublic fora and should be judged on that standard, that a reasonable jury could find the exclusion was actually prompted by a disagreement with Fair's position would render it not "viewpoint neutral" and accordingly not permissible under First Amendment principles. *See Make the Road*, 378 F.3d at 143 (stating that restrictions on speech in nonpublic for "need only be reasonable and viewpoint neutral") (citing *Lee*, 505 U.S. at 679). Access to even a nonpublic forum cannot be restricted solely in "an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800.

B. First Amendment Retaliation Claim

Neither party directly briefed the issue of First Amendment retaliation. Fair's brief incorrectly combines the questions of retaliation and forum-based standards, *see, e.g.*, Pl.'s Opp'n Br. at 10, and thereby fails to address the chilling requirement for a retaliation claim, and Esserman's brief does not touch the issue at all. Nevertheless, the parties did discuss that claim during the oral argument on this motion.

When a private citizen makes a claim of First Amendment retaliation against a public official, the Second Circuit requires that plaintiff to show:

> '(1) [the plaintiff] has an interest protected by the First Amendment; (2) [the defendant's] actions were motivated or substantially caused by [her] exercise of that right; and (3) [the defendant's] actions effectively chilled the exercise of [her] First Amendment right.'[4]

*Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). I assume here that Fair has met the protected activity requirement, and proceed to consider the second and third elements.

To meet the causation requirement, the plaintiff must show evidence that amounts to more than "but for" causation, and indicates that the defendant acted with retaliatory intent. *See Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 30 (2d Cir. 1996) (discussing the state of mind requirement for a retaliation claim in the litigation context); *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 909 F. Supp. 1187, 1193 (S.D. Ind. 1995), *aff'd,* 100 F.3d 1287 (7th Cir. 1996) (rejecting plaintiff's "but for" causation

---

[4] The "chilling" requirement has also be formulated more generally as an "adverse action" requirement, apparently because of some spillover from retaliation claims in the employment context; regardless, courts seem to agree that the chilling element is required where, in cases like the present one, "a plaintiff states no harm independent of the chilling of [her] speech." *Puckett v. City of Glen Cove*, 631 F.Supp. 2d 226, 239 (E.D.N.Y. 2009); *see also Bartels v. Inc. Vill. of Lloyd*, 751 F. Supp. 2d 387, 397 (E.D.N.Y. 2010) (holding that the chilling element is necessary where no other harm is alleged).

16

argument, observing that "the law of retaliation focuses on the desire to punish or get even"). If the plaintiff shows by a preponderance of the evidence that the defendant had improper motivations for his actions, however, the defendant may still avoid liability if he can show that he would have taken the same actions even in the absence of his retaliatory motive. *See Greenwich Citizens Comm., Inc.*, 77 F.3d at 31 (adopting the dual-motivation analysis articulated in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)).

Viewing the record in the light most favorable to Fair, a reasonable jury could find that Esserman has essentially admitted the causation element. There is no question that his actions in closing the ComStat meetings to the public were the direct result of Fair's comments, and were specifically aimed at preventing her attendance and comments at subsequent meetings. Esserman has argued that Fair was removed as a procedural matter for being "disruptive," but a reasonable jury could just as easily infer that he was motivated by hostility towards the content of her comments, which were critical of the department. Moreover, even if Esserman himself harbored no retaliatory animus against Fair, other courts have suggested that the requisite motive may be shown if the government is acting "in deference to the hostility of another party toward a particular viewpoint"—*i.e.*, in this case, if Esserman's actions were intended to placate other members of the department upset by the content of Fair's speech. *Grossbaum*, 909 F. Supp. at 1196 (citing *Air Line Pilots Ass'n Int'l v. Dept. of Aviation*, 45 F.3d 1144, 1157 (7th Cir. 1995)).

To meet the chilling requirement, Scott "must come forward with evidence showing either that (1) [the defendant] silenced [her] or (2) [the defendant's] actions had some actual, non-speculative chilling effect on [her] speech." *Williams*, 535 F.3d at 78 (quotation marks and citation omitted). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1,

17

13–14 (1972). Thus, "[w]here a party can show no change in [her] behavior, [s]he has quite plainly shown no chilling of [her] First Amendment right to free speech." *Curley*, 268 F.3d at 73. If Fair's retaliation claim relied solely on evidence that her speech was chilled outside of that context, it would not be sufficient to survive the Esserman's motion—when asked at the hearing, Fair claimed she suffered from a loss of confidence and ostracization from her activist community, which is precisely the kind of subjective chill the Supreme Court has held to be inadequate. As noted above, however, a reasonable jury could find that Esserman's targeted exclusion of Fair from the ComStat meetings impermissibly silenced her by preventing her from speaking at or attending subsequent ComStat meetings, even after those meetings had been reopened to the public. Thus, to the extent that Fair claims she was "silenced" by her targeted exclusion from the ComStat meetings, her retaliation claim simply overlaps with her claim of a direct First Amendment violation and survives as an alternative to that claim.

C. <u>Miscellaneous Remaining Issues</u>

Esserman argues that to the extent Fair is still seeking injunctive relief, that claim should be denied as moot because Esserman is no longer employed as the Chief of Police. Def.'s Br. at 1 n.1. The complaint states that Esserman is sued "in his individual and official capacities." Compl. at ¶ 4. Accordingly, the claim for injunctive relief against Esserman in his personal capacity is **dismissed** and the claim for such relief against his official capacity will proceed, but the current Chief of Police should be substituted for Esserman pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See Correction Officers Benev. Ass'n v. Kralik*, 2009 WL 856395, at *5 (S.D.N.Y. Mar. 26, 2009). I note, however, that the relief Fair is seeking may be mooted out in light of Esserman's statement that she is currently permitted to attend ComStat meetings.

Fair also asserts that Esserman has now waived his qualified immunity argument by failing to discuss that defense in his motion. There is no requirement, however, that qualified immunity be raised at this stage of the proceedings. Instead, following the procedure explicitly endorsed by the Second Circuit of considering qualified immunity only after a jury verdict is rendered, *see Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir. 2003), Esserman here can and has reserved his qualified immunity argument without waiving it.

## IV. Conclusion

Esserman's motion for summary judgment is **denied** in substantial part. His motion for summary judgment on Fair's claims of direct and retaliatory violations of her First Amendment rights is **denied**. Fair's claim for injunctive relief against Esserman in his personal capacity is **dismissed** and the claim for such relief against his official capacity will proceed, but the current Chief of Police should be substituted for Esserman pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

Within **one week** of this Order, the parties shall jointly contact the court to schedule a calendar call in order to set trial dates in this matter.

So ordered.

Dated at Bridgeport, Connecticut, this 12th day of July 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge